IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| JEAN E. TOLUD AND DIONNE G. SINCLAIR, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:19-cv-0039 |
| | ) | |
| ALEXANDER "SASHA" BOUIS AND TARA ANNE BOUIS, | ) | |
| | ) | |
| Defendants. | ) | |

APPEARANCES:

CAROL ANN RICH, ESQ.
MALORIE DIAZ, ESQ.
DUDLEY & RICH
ST. THOMAS, U.S. VIRGIN ISLANDS
    For Plaintiffs

DIONNE G. SINCLAIR, ESQ., *PRO-SE*
ST. THOMAS, U.S. VIRGIN ISLANDS
    For Plaintiffs

RYAN C. MEADE, ESQ.
RYAN MEADE CHARTERED ATTORNEY, LLC
ST. THOMAS, U.S. VIRGIN ISLANDS
    For Defendants.

**MEMORANDUM OF DECISION**

**MOLLOY, Chief Judge**

**THIS MATTER** came before the Court for a bench trial held on February 22-24, 2021, via Microsoft Teams. Following the trial, the parties submitted proposed findings of fact and conclusions of law to the Court. (ECF Nos. 102 and 103.) Having fully considered the testimonial and documentary evidence presented and admitted at trial, as well as the arguments of counsel and the applicable law, the Court makes the following findings of facts and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

# I. <u>FINDINGS OF FACT</u>[1]

## A. The Parties

1.      Plaintiffs Jean E. Tolud ("Tolud") and his wife, Dionne G. Sinclair ("Sinclair") (collectively, "Plaintiffs," "Buyers," or "Toluds") are citizens of the United States Virgin Islands and reside with their three children in St. Thomas, U.S. Virgin Islands. Compl. at ¶¶ 1-2; Trial Tr. 1 (ECF No. 95) at 5:9-12.

2.      Tolud and Sinclair are practicing attorneys who moved to St. Thomas in August 2016. *Id.* at 6:1-19, 61:21-62:1; Trial Tr. 2 (ECF No. 96) at 6:1-18.

3.      Defendant Alexander "Sasha" Bouis ("Bouis" or "Sasha") is a citizen of the State of Florida, where he has resided for over two years. Complaint at ¶ 3; Answer at ¶ 1; Trial Tr. 2 at 146:13-17.

4.      Bouis is married to Defendant Tara Anne Bouis (collectively, "Defendants," "Sellers," or "Bouises"), and they have two daughters. *Id.* at 146:1-8, 11.[2] Tara Bouis is a citizen and resident of the State of Florida. At all times relevant to the facts in this case, Tara Bouis was a stay-at-home mom rearing her two daughters.

5.      Bouis has a bachelor's degree in mechanical engineering from the Massachusetts Institute of Technology ("MIT"). *Id.* at 146:18-22.

6.      Bouis served on the Board of Directors ("Board") of the Cowpet Bay East Condominium Owners Association ("CBECOA") during the relevant events of this matter. *Id.* at 150:22-152:21, 153:23-25, 156:13-20, 181:5-182:13.

---

[1] The Findings of Fact include the Court's credibility determinations regarding the testimony and evidence presented at trial. Credibility determinations are within the sole province of the finder of fact, in this case the Court. Fed. R. Civ. P. 52. *See, e.g., Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

[2] Plaintiffs originally filed this action for fraudulent concealment and fraud in the inducement against Defendants in the Superior Court of the Virgin Islands on April 24, 2019. *See* ECF No.1-1. Defendants removed the proceeding to this Court by Notice of Removal (ECF No. 1) on June 12, 2019. According to the Notice of Removal (ECF No. 1) at 3, Complaint (ECF No. 1-1) at ¶ 4, and Answer (ECF No. 4) at ¶ 1, Defendant Tara Anne Bouis is a citizen and resident of Florida or, at least, was at the time of the filing of the complaint and at the time of removal. *See, e.g., In re Lipitor Antitrust Litig.*, 855 F.3d 126, 150-51 (3d Cir. 2017) ("Since this case was removed to federal court, diversity must have existed both at the time the *RP Healthcare* plaintiffs' state court complaint was filed and at the time of removal." (citations omitted)).

**B. Cowpet Bay East Condominium and 22 Tara Way**

7.      Defendants purchased the condominium ("condo") at issue, located at 22 Tara Way ("Unit 22" or "22 Tara Way"), Cowpet Bay East Condominium ("CBEC"), St. Thomas, U.S. Virgin Islands, for approximately $459,000 in 2015, in a foreclosure sale. *Id.* at 149:17-150:11.

8.      The condo consists of three (3) separate living areas.   The main residential area and a one-bedroom studio are both located on the lower level and have separate entrances. The upper level, referred to as the "loft" has a private entrance, bathroom, and kitchen. Trial Tr. 1 at 14:1-16:9.

9.      Both the one-bedroom studio and the loft were set up and used as rentals or potential rental units. Trial Tr. 2 at 113:8-114:11, 214:17-215:7.

10.      The condo was in a "gutted" condition at purchase, and Defendants "put a significant amount of work into it." Trial Tr. 2 at 223:19-224:12. Defendants completely renovated the loft. *Id.* at 150:12-15. Bouis estimated the renovation costs at close to $400,000. *Id.* at 224:13-14.

11.      Bouis was elected to the CBEC Owners' Association ("CBECOA" or "Association") Board of Directors at the annual meeting of the CBECOA in January 2017 and served as the Board's Secretary throughout 2017. Trial Tr. 2 at 151:5-152:11, 182:1-9.

12.      As Secretary, Bouis attended Board meetings (either telephonically or in person) and took minutes of the meetings. Bouis distributed the minutes of the meetings to the board members for their approval. *Id.* at 152:12-21.

13.      Hurricanes Irma and Maria impacted St. Thomas in September 2017 causing catastrophic damage throughout the Territory, including significant damage to the CBEC property.[3]

---

[3] The Court takes judicial notice of the fact that Hurricane Irma, which made landfall on the island of St. Thomas, on September 6, 2017, and Hurricane Maria, which brushed St. Thomas on September 19, 2017, (together, the "Hurricanes") reached Category 5 on the Saffir-Simpson Hurricane Wind Scale employed by the National Hurricane Center of the United States National Oceanic and Atmospheric Administration.

14.    The Board retained Paul Ferreras ("Ferreras"), a structural engineer, to inspect the hurricane damage to the CBEC units and prepare a report with proposed reconstruction. Trial Tr. 1 at 137:3-12, 144:15-20; Trial Tr. 2 at 156:17 - 157:1.

15.    The initial report produced by Ferreras ("First Ferreras Report"), dated October 24, 2017, and addressed to the CBECOA Board, includes proposed reconstruction to be done on the CBEC property, including repair recommendations for each unit. Pls.' Ex. 4 (identified in the page headers as "Visual Observation and Limited Evaluation, Cowpet Bay East Condominium – Parcel 8-1-7 Estate Nazareth, Hurricane Irma -- Structural Damage Assessment). *See* also Trial Tr. 1 at 142:7-24; Trial Tr. 2 at 156:4-12.

16.    This First Ferreras Report was prepared primarily for purposes of insurance and does not contain all the reconstruction or repairs to be done. Trial Tr. 2 at 76:9-21, 183:16-19, and Pls.' Ex 7.

17.    Bouis was off island during the Hurricanes, but he returned to St. Thomas for a visit in late October or early November 2017 and inspected Unit 22, the interior of which, particularly the renovated loft area, appeared to be "relatively unscathed" and "in good shape" following the Hurricanes. Trial Tr. 2 at 157:5 - 158:7, 162:15-18, 163:5-14.

18.    Sometime after the Board meeting held on November 9, 2017, Bouis received the First Ferreras Report (Pls.' Ex. 4) to distribute to all the condominium owners, although he was unable to recall the date he received the First Ferreras Report or the board member who provided it to him to distribute to the owners. Trial Tr. 2 at 159:14-25, 166:3-11.

19.    Bouis testified that he only "skimmed" the 78-page report, except he said he read all of page 67 of the said report which provides, regarding "Building 11 – Recommendations: . . . Unit 22 Upper," in part: "[D]emo the damaged and weakened sections of the masonry supports down to solid material and reconstruct the walls, including vertical and horizontal reinforcements; fill all CMU cells solid with mortar. . . ." Pls.' Ex. 4 at 67 (Bates Stamp No. TS-000148); *see also* Pls.' Ex. 4 at 29 (Bates Stamp No. TS-000110) (containing the same information); Trial Tr. 2 at 160:10-16, 161:6-8, 162:4-8, 163:15-20.

20.    The "CMU cells" in Unit 22 were located in a wall in the loft. Trial Tr. 1 at 45:10-17; Pls.' Ex. 5 at 14 (Bates Stamp No. TS-000055).

21.    In preparation for the CBECOA 2018 annual meeting, which was held on January 28, 2018, a meeting that Bouis attended in person, Bouis distributed to the membership-at-large an "owners' package," which included the First Ferreras Report (Pls.' Ex. 4). Trial Tr. 2 at 159:23 - 160:1, 167:10-22, 180:12-21, 181:5-12.[4]

22.    Another document, summarizing the repairs that would be the financial responsibility of the CBECOA and the repairs for which the owners would be financially responsible, also was included in this "owners' package." Bouis reviewed this document carefully. *Id.* at 172:14 - 174:13; Pls.' Ex. 6 at 18 (Bates Stamp No. TS-000033).

23.    That document contains a footnote that provides: "All reconstruction and repairs COA must be made according to substantially the same plans, specifications, design, and total cubic area pursuant to which the buildings were initially constructed. Owner improvements and betterments since original construction are not the Board's responsibility." Trial Tr. 2 at 174:21 - 175:4.

24.    Bouis testified that he understood the footnote to mean that any improvements Defendants had made to the condo that were impacted or torn out by the hurricane repairs would not be replaced during the reconstruction and would be, instead, Defendants' responsibility as the owners of the condo. *Id.* at 178:18 - 179:17.

25.    Minutes from the January 28, 2018, annual meeting of the CBECOA state:

> A second, more detailed report is in progress. . . . Paul Ferreras' second, complete unit by unit assessment of damages that are the responsibility of the association will be used to prepare a detailed package of drawings and specifications suitable for issuance to contractors to bid on. The second Ferreras report, in draft form, will be provided to owners to review as it pertains to their unit for accuracy and completeness.

Pls.' Ex. 7 at 2 (Bates Stamp No. TS-000065); Trial Tr. 2 at 184:11-12, 184:25 - 185:5, 187:14-16.

---

[4] The Court finds that the transcript's notation of "September 17, 2017" as the date which Bouis distributed the package to the membership at large, is in error. Trial Tr. 2 at 160:1. Upon review of the audio recording of the trial, the Court concludes that the date was "December 17, 2017." Record evidence in support of this revised date includes Bouis's testimony that the First Ferreras Report (Pls.' Ex. 4), dated October 24, 2017, was part of what he sent to the membership in this package. Trial Tr. 2 at 159:23-25. Consequently, the package -- containing the First Ferreras Report, dated October 24, 2017 -- could not have been distributed by Bouis on September 17, 2017.

26.     Those minutes also asked owners to contact Tony McDonald ("McDonald"), Chair of the Reconstruction Committee, if they noted any omissions in the draft form of Paul Ferreras's second report. Pls.' Ex. 7 at 2 (Bates Stamp No. TS-000065).

27.     During that January 28, 2018, CBECOA meeting, the Association members voted in favor of reconstructing the CBEC property. *Id.*; *see also* Trial Tr. 1 at 162:19-25.

28.     The members also elected Board members for 2018 at the said meeting. Bouis was re-elected to the Board, but he did not serve as secretary in 2018 and did not take the minutes of the 2018 meeting. Trial Tr. 2 at 182:1-13.

29.     On February 21, 2018, the Board held a special meeting, where McDonald's update to the Board included that "[i]t is expected that the Draft of the Scope of Work will arrive tomorrow or the first of next week" and that "[w]hen received . . . [i]t will be sent out to the contractors for a prelim bid." Pls.' Ex. 15; Trial Tr. 2 at 191:10-13. The "plans" also had to be approved for permitting by the Department of Planning and Natural Resources ("DPNR"). *See* Trial Tr. 1 at 168:6-24.

30.     After Bouis had the "plans" approved by DPNR, Ferreras took a copy of the "plans," that is, as the Court understands it, the Second Ferreras Report (Pls.' Ex. 5), to Andy LaPlace's ("LaPlace"), CBEC Property Manager's, office for safekeeping, and LaPlace then notified the Board members that the plans were in his office and available for review upon request. Trial Tr. 1 at 169:18 - 170:21.

### C. Sale and Purchase of 22 Tara Way, Cowpet Bay East Condominium

31.     The Tolud Family's rented apartment in Estate Mandahl in St. Thomas, was destroyed by Hurricane Irma, resulting in the Tolud Family losing virtually everything and living elsewhere. *Id.* at 7:9 - 8:1; Trial Tr. 2 at 8:5 - 9:2.

32.     After securing a temporary sublet in October 2017, Plaintiffs began looking for a more permanent dwelling. Trial Tr. 1 at 8:16 - 10:11. Trial Tr. 2 at 10:8-20, 11:12 - 12:4.

33.     Shelley Blythe and Marni Walters ("Walters") from USVI Sotheby's International Realty were Plaintiffs' realtors and agents. Pls.' Ex. 1 at 3; Trial Tr. 2 at 10:16-23, 108:1-12.

34.    In March 2018, Defendants listed Unit 22 for sale for $850,000 with Robert Barringer ("Barringer") of Sea Glass Properties as their listing agent. Trial Tr. 2 at 114:12-15, 208:16-18, 210:10-13.

35.    Defendants marketed Unit 22 as a property with minimal damage that had unique extra improvements to the loft area and a track record as a fully booked rental property. Trial Tr. 1 at 12:11-22; Trial Tr. 2 at 214:17 - 215:7, 220:9-19.

36.    Unit 22 appeared to be a home in "move-in-ready" condition, according to Marni Walters. Trial Tr. 2 at 131:21-24.

37.    Before seeing 22 Tara Way, CBEC, Plaintiffs made an offer to purchase a different property, which also needed some repairs, but was listed at $550,000 ($300,000 less than the list price of 22 Tara Way). Trial Tr. 1 at 10:12 - 11:10, 12:24 - 13:4.

38.    On or about March 16 or 17, 2018, Walters showed Unit 22 to Plaintiffs. Trial Tr. 2 at 13:5-14.

39.    Plaintiffs observed no interior damage from the Hurricanes, but they did notice that the sunroom was unfinished, and the glass windows were boarded up from the outside. Trial Tr. 1 at 16:12-20. This viewing confirmed Tolud's understanding of the realtor's listing, namely, that the condo was renovated and that there was minimal damage from Hurricane Irma. Trial Tr. 1 at 12:14-16.

40.    Before making an offer on Unit 22, Tolud requested information through his realtors. He received the minutes from the annual meeting and possibly some financial reports. *Id.* at 17:17 - 19:7.

41.    Those documents and some others obtained by Tolud were sent to him via emails to which Walters, Barringer, and sometimes Bouis were copied. *Id.* at 17:17 - 18:11.

42.    Tolud also requested the "Ferreras Report" and "Tony McDonald's report" referenced in the 2018 annual meeting's minutes. *Id.* at 19:4-9. Despite his request, Tolud did not receive the First Ferreras Report before closing and nor did he receive a report from Defendants. Tolud testified that "[t]he first time [he] saw [the First Ferreras Report] was September 24th, 25th of 2018" and that it was provided to him by LaPlace. Trial Tr. 1 at 34:3-12; *see also id.* at 137:3-12.

43.    On March 16, 2018, Bouis received via email the *Scope of Work Repairs* for Unit 22 (Pls.' Ex. 3), dated March 3, 2018.[5] Trial Tr. 2 at 187:14-23, 251:13-21, 253:15-22, 255:21-24.

44.    Bouis testified that he emailed McDonald to confirm receipt and then sent a second email to tell him that some information regarding Unit 22 was "missing," namely, that Work Item 10, "Replace sliding glass doors . . ." was not marked for Unit 22, although the sliding glass doors needed to be replaced. *Id.* at 253:23 - 255:19; *see also* Pls.' Ex. 3 at 3 (Bates Stamp No. TS-000014).

45.    Based upon this acknowledgment that he noticed discrepancies between the First Ferreras Report and the *Scope of Work Repairs*, the Court finds not credible Bouis's testimony that the information in the First Ferreras Report "was identical" to the information in the *Scope of Work Repairs*. Trial Tr. 2 at 225:5-9, 228:5. It cannot be disputed that the *Scope of Work Repairs* (Pls.' Ex. 3) does not contain all the recommendations itemized in the First Ferreras Report for Unit 22, such as "[d]emo the damaged and weakened sections of the masonry supports down to solid material and reconstruct the walls including vertical and horizontal reinforcements; fill all CMU cells solid with mortar," Pls.' Ex. 4 at 67 (Bates Stamp No. TS-000148), which Bouis affirmed that he read at the time he received it. Trial Tr. 2 at 163:15-22.[6]

46.    By extension, the Court finds Bouis's stated reason for not providing the Ferreras reports to Tolud, that "[a]s far as [he] knew, that information matched what [he] had already given to him," Trial Tr. 2 at 226:19 - 228:3, that is, the *Scope of Work Repairs* and the information contained therein, not credible.

47.    Through the real estate agents, Bouis provided the *Scope of Work Repairs* (Pls.' Ex. 3) to Tolud the day after he received it, that is, on March 17, 2018. *Id.* at 255:21-24; Ex. B

---

[5] Although there is no definitive evidence regarding the origin of the *Scope of Work Repairs* (Pls.' Ex. 3), the Court determines, based upon the testimony of Bouis, Trial Tr. 2 at 251:2-12 (where Bouis states that the draft was split into individual units and the individual owners received the plans for their unit), that it was taken from the draft of the Second Ferreras Report.

[6] LaPlace also testified that there was nothing in the *Scope of Work Repairs* document that mentions the demolition and replacement of a CMU wall. Trial Tr. 1 at 220:13 - 222:19, 223:3-25.

at 2-3; Trial Tr. 1 at 20:16-25, 21:14-17. However, Bouis did not advise the Toluds that the *Scope of Work Repairs* was inaccurate or incomplete:

> Q:    And you didn't advise Mr. Tolud or Ms. Sinclair that the Scope of Work you gave them, which you said was complete, had errors in it, did you?
>
> A:    I did not.

Trial Tr. 2 at 269:13-16, 269:17 - 270:2; *see also* Ex. B at 2-3.

48.    In addition to the error noted by Bouis regarding Work Item 10 listed on the *Scope of Work Repairs* (Pls.' Ex. 3), Work Item 8c shows internal reconstruction for loft units, but an X was not marked in the column "work items at this unit" beside 8c. *See* Pls.' Ex. 3 at 3 (Bates Stamp No. TS-000014). Tolud testified that the missing X indicated that the work identified at 8c was not going to be done in the loft in 22 Tara Way and, thus, that it was his understanding "that there wasn't going to be any [work done in the loft] -- or it wasn't going to be anything particularly destructive." Trial Tr. 1 at 25:11-25.

49.    Although Bouis and Tolud never discussed the document, *id.* at 21:18-20, Bouis represented to Tolud via email that the *Scope of Work Repairs* (Pls.' Ex. 3) was "the entire Paul Ferreras' report as it applied to 22 Tara."[7] Trial Tr. 1 at 23:8-15, 23:25 - 24:11, 88:15-21; 104:7-12. Further, based upon this representation and the fact that Bouis has an engineering degree from MIT, Tolud accepted that the *Scope of Work Repairs* was all the "Paul Ferreras' materials" relevant to Unit 22. Trial Tr. 3 at 11:9-20.

50.    The Court finds that Bouis gave inconsistent testimony at trial about what information he provided to the Toluds regarding the scope of repairs to be completed in Unit 22. Bouis initially testified that he did not convey to Tolud that the *Scope of Work Repairs* was inaccurate or incomplete and that he correspondingly did not alert the Toluds upon his receipt of the Second Ferreras Report, that the correction still hadn't been made to the list of repairs to be made to Unit 22:

> Q:    And you didn't advise Mr. Tolud or Ms. Sinclair that the *Scope of Work* you gave them, which you said was complete, had errors in it, did you?
>
> A:    I did not.

---

[7] The date of this email and/or when Tolud read it was not specified at trial or in the record.

> Q:    And you didn't do anything to rectify those errors, even when you saw the plans and realized that that hadn't been fixed, did you?
>
> A:    That's not correct. I reached out to Tony McDonald and I said, "Hey, my corrections have not been incorporated."
>
> Q:    But you didn't convey that information to your buyers or provide them with any updated information about the *Scope of Work* or the need to follow up on errors, did you?
>
> A:    That's correct.

Trial Tr. 2 at 269:13 - 270:2; Ex. B at 2-3. Yet only minutes later, Bouis testified as follows:

> Q:    Mr. Bouis, you knew there were errors in the *Scope of Work?*
>
> A:    Yes.
>
> Q:    You got the [Second Ferreras Report] plans and knew the errors weren't corrected?
>
> A:    That's correct.
>
> Q:    You didn't provide the plans to Mr. Tolud and Ms. Sinclair so that they could be aware of those things and . . . .
>
> . . .
>
> A:    I provided the Toluds with my response [to McDonald, upon Bouis receiving the *Scope of Work Repairs*] highlighting the errors in the *Scope of Work* when I provided the *Scope of Work*.
>
> Q:    Where did you produce that in this case?
>
> A:    I emailed it to the Toluds.
>
> . . .
>
>        I believe I provided the -- my personal response when I told – the response to the Scope of Work – to my agent.
>
> Q:    And so if your agent -- and you instructed your agent to provide that to Mr. Tolud and Ms. Sinclair?
>
> A:    Yes. I believe I sent them photos at the same time, which is why I didn't send the *Scope of Work* on the date that I received it. That was part of my response to the Board. But I can check my email and refresh my memory of that.

Trial Tr. 2 at 270:10 - 271:22.

Notwithstanding the above testimony, the lone exhibit entered at trial by Defendants -- an email Barringer sent on behalf of Bouis to Tolud, (Defs.' Ex. B),[8] to which he attached

---

[8] The complete text of the email dated March 17, 2018, as provided by Defendants at trial, provides as follows:

*Tolud, et al. v. Bouis, et al.*
Case No. 3:19-cv-0039
Memorandum of Decision
Page 11 of 27

the *Scope of Work Repairs* -- evidences no such disclosure to the Toluds, as the complete reference to the *Scope of Work Repairs* attached to the email consists of two sentences: "3. We just received a scope of work letter for our individual unit. I've attached the letter to this email." Defs.' Ex. B at 2-3. Even assuming the email was drafted by Barringer rather than by Bouis, the attached *Scope of Work Repairs* would have been provided by Bouis and that document has no notation of any errors to be rectified nor is there reference in the email to any photos or to Bouis's response to McDonald, "highlighting the errors in the *Scope of Work*," as testified at trial.

51.     The Court also notes that Bouis indicated that he thought it important that the Buyers know of the deficiency in the *Scope of Work Repairs*, by testifying that he believed he had advised them of the omission(s) therein, but that he didn't see that as sufficient reason to update them that the deficiency had not been remedied in the Second Ferreras Report:

Q:      But you didn't reach out to your buyers?

A:      That's correct.

Q:      And you didn't think that was something they needed to know?

---

1.  The exterior defaults that allowed water into the condo during the storms is the responsibility of the condo. The interior finish of the walls & ceiling is the responsibility of the owner. The interior finish will be quick and easy, we are waiting on the association to repair exterior before we refinish the interior. We've not have [sic] any active water damage since Maria.
2.  A timeline is becoming more solid – Sasha (owner of unit) is on the CBE board. We hope to have a contractor for association repairs in April and work will begin in May.
3.  *We just received a scope of work letter for our individual unit. I've attached the letter to this email.*
4.  We were in the process of enclosing part of the balcony to gain additional living space – a sitting/florida [sic] room. We are happy to provide structural drawings for the addition.
5.  The solar panels are owned by the association and they offset the overall usage by the association but our individual units's [sic] power is still metered and billed for usage. Solar panels are covered by insurance and will be reinstalled by the association.
6.  These units are originally designed to be rented partially or fully and there is no language in the by-laws prohibiting rental.
7.  There are several large back-up generators on property. One powers critical systems and security lighting. Another provides full power to the entire property. Both kick-on within a few seconds of WAPA going down – we rarely notice when the power goes out on island!
8.  The cost of water is 10 cents per gallon. That covers sewerage and twice daily trash removal from your porch. Toilets flush with non-potable water and there is no charge for toilet water.
9.  Insurance was renewed Jan 30, 2018 [sic] and those reflect current rates.

Ex. B at 2 (emphasis added).

*Tolud, et al. v. Bouis, et al.*
Case No. 3:19-cv-00039
Memorandum of Decision
Page 12 of 27

> A:      I was under the impression that I had already advised them of the deficiency in the *Scope of Work*.
>
> Q:      Really? You believe that you had, prior to receiving the plans and knowing that the *Scope of Work* hadn't changed, that you had advised them that it had deficiencies? Is that what you're saying?
>
> A:      Yes.

Trial Tr. 2 at 273:13-23.[9]

52.     Based upon the error-filled *Scope of Work Repairs* (Pls.' Ex. 3) and Bouis' representation that that was all the Ferreras material and there was nothing else relevant to Unit 22, Tolud, knowing that Bouis has an engineering degree from MIT, felt there was nothing else he could say, but he "requested, simply, that [the Bouises] agree to keep [him] in the loop if there was any new material, or if there is anything relating to the vote, to the loft, whatever, keep [him] in the loop," which Tolud testified that Bouis and the agents agreed to do.[10] Trial Tr. 3 at 11:9 - 12:4.

53.     Through Walters, on March 18, 2018, using Sotheby's standard form contract, Plaintiffs made an offer to purchase Unit 22 for $780,000, which was accepted by Defendants the same day. Pls.' Ex. 1; Trial Tr. 2 at 124:1-12.

54.     The Contract provided for a 14-day inspection period, followed by 48 hours for Buyers to cancel. Pls.' Ex. 1 at paragraph 7(a); Trial Tr. 1 at 76:1-22, 115:8-11. The 14-day inspection period expired on April 1, 2018. Trial Tr. 1 at 76:9-11.

55.     During the inspection period, Tolud continued to ask questions based upon the documents he received, specifically requesting the "Paul Ferreras' Report" several times. *Id.* at 27:12-17, 103:19-22.

56.     At no time throughout that period or even before closing on June 19, 2018, was either the First Ferreras Report (dated October 24, 2017) (Pls.' Ex. 4) or the Second Ferreras Report (dated March 14, 2018) (Pls.' Ex. 5) provided to Tolud by Bouis or his agent. Trial Tr. 1 at 34:10-12, 39:23 - 40:10, 115:12-25; *see also* Trial Tr. 2 at 278:4-17.

---

[9] *Compare* Bouis's earlier testimony at Trial Tr. 2 at 269:13-16, where he stated that he did not advise the Toluds of the errors contained in the *Scope of Work Repairs* (Pls.' Ex 3).
[10] The date(s) when this request was conveyed to Bouis and his response to Tolud was not specified at trial or in the record.

57.     During the inspection period, Tolud also sought documents and information from Steve Russell, ("Russell") attorney for the CBECOA, who, after authorization from Bouis, provided some information, e.g., regarding CBEC insurance, but for other information, like the "Ferreras Report" and "Tony McDonald's Report," Russell referred Tolud back to Bouis, as a member of the Board. Pls.' Ex. 23; Trial Tr. 1 at 103:23 - 104:2, 104:23 - 105:21.

58.     On April 6, 2018, five days after the inspection period ended, but prior to closing, Bouis received the Second Ferreras Report (Pls.' Ex. 5), dated March 14, 2018, from McDonald via email, in response to Bouis's inquiry. Trial Tr. 2 at 195:7-13, 195:17 - 196:5, 278:8-11.[11]

59.     Bouis testified that he read only one page of the Second Ferreras Report, namely, page 3 (Pls.' Ex. 5 at Bates Stamp No. TS-000044), to compare the work listed in its "Scope of Work – Master List" and "Schedule of Repairs" for Unit 22 to the previous *Scope of Work Repairs* (Pls.' Ex. 3) and see if they matched. Trial Tr. 2 at 204:12-14, 203:8-11.

60.     The "Scope of Work – Master List" and "Schedule of Repairs" for Unit 22 in the Second Ferreras Report (Pls.' Ex. 5 at 3( Bates Stamp No. TS-000044)) appears to be the same as the *Scope of Work Repairs* (Pls.' Ex. 3), including the omission of the replacement of the sliding glass doors at item 10, which was not corrected, even though Bouis notified McDonald of the error upon receiving the *Scope of Work Repairs* in March 2018.[12]

61.     A review of the said report also reveals that the language of the First Ferreras Report regarding the CMU cells also is not included in the "Scope of Work – Master List." *See* Pls.' Ex. 5 at 3 (Bates Stamp No. TS-000044). The term "CMU" is mentioned in the Second Ferreras Report only in the instruction "Demo Existing CMU Wall" on page 14 of the report (Pls.' Ex. 5 (Bates Stamp No. TS-000055)) as part of the work to be done in the loft level of the upper condos, like Unit 22.

---

[11] Despite the production of the *Scope of Work Repairs* and the full Second Ferreras Report, there is no record of the complete draft report ever being provided to Plaintiffs. *See* Trial Tr. 2 at 251:2-12 (where Bouis states that the draft was split into individual units and the individual owners received the plans for their unit). Moreover, the full Second Paul Ferreras report was never presented to nor discussed by the Board during Bouis's tenure as a Board member. *Id.* at 187:24 - 188:5, 258:4-24; see also Trial Tr. 1 at 204:15-18.

[12] The sliding glass doors never were included in the list of repairs to be completed, forcing Tolud to purchase replacement doors himself. Trial Tr. 1 at 124:5-9.

62.     Bouis testified that, when he saw that the scope of work in the Second Ferreras Report matched the *Scope of Work Repairs* document he had received earlier, he did not read anything else in the report, looking at none of the drawings and diagrams that specifically outlined the work to be completed in the units. *Id.* at 202:21-25, 203:8-11, 204:12-21.

63.     Even though, at that point, the condo was under contract for sale and, thus, Bouis perhaps was less concerned about the reconstruction of CBEC than he might otherwise have been, the Court does not find credible that Bouis did not review more than one page of the Second Ferreras Report.

64.     Because Bouis, as both a member of the Board and the owner of a condo, had received both Ferreras reports, the Court finds that he had reason to know, prior to the closing date for the sale of Unit 22, that the CMU wall in Unit 22 was to be demolished and rebuilt.

65.     Bouis testified that he "reached out to Tony McDonald" to let him know that his corrections, to the *Scope of Work Repairs*, had not been incorporated into the master document, that is the Second Ferreras Report, but he did not at any point provide this information to Plaintiffs, the Buyers. *Id.* at 269:17 -270:2, 272:11 - 273:14.

66.     Tolud did not receive the Second Ferreras Report (Pls.' Ex. 5) or "plans," dated March 18, 2018, from Bouis or anyone else during the inspection period. However, even after the inspection period had ended on April 1, 2018, Tolud continued to request additional information until the closing date. Trial Tr. 2 at 278:4-7.

67.     Bouis first testified that he did not provide the Second Ferreras Report because McDonald "specifically said it was not for distribution." Trial Tr. 2 at 196:2-6; 278:4-23. Bouis stated that he believed that meant "if it wasn't to be distributed to the owners, it should certainly not be distributed to anyone else." *Id.* at 278:19-21. However, he never inquired of McDonald or other Board members -- then or later – whether he could provide the report to Tolud. *Id.* at 196:7-22, 197:24 - 198:3.

68.    Bouis next testified that he didn't think the report "was relevant" since Tolud said he was "satisfied"[13] and because the Scope of Work in the Second Ferreras Report matched the *Scope Work Repairs* he had provided to Tolud already. *Id.* at 227:23 - 228:17; *see also id.* at 203:8-11, 278:12-17.

69.    The Bouises and Toluds closed on the sale of 22 Tara Way on June 19, 2018. *Id.* at 277:24-278:3.

### D. Reconstruction of Unit 22

70.    On July 1, 2018, nearly two weeks after the closing, Tolud saw the Second Ferreras Report (Pls.' Ex. 5) for the very first time, when Bouis gave him a "plastic folder full of a bunch of documents and stuff that related to the plans and the apartment . . . ," including the Second Ferreras Report. Trial Tr. 1 at 40:4 - 41:7.[14]

71.    Upon reviewing the Second Ferreras Report, dated March 14, 2018, Tolud was "very upset" to read page 14 of the report (Pls.' Ex. 5 at Bates Stamp No. TS-000055), showing a diagram with the description, "Demo existing CMU wall," on the construction plans, "[b]ecause that meant they would have to take out a wall in [his] loft." Trial Tr. 1 at 45:10-17.[15]

72.    Bouis testified that his first encounter with the term "CMU wall" was when he received the lawsuit from the Toluds, leading him to "Google" the term for a definition. Trial Tr. 2 at 205:8-10. Yet, as recited herein (*see* ¶ 19, *supra*), the page of the First Ferreras Report that Bouis testified that he read lists the repairs to Unit 22 to include: "Demo the damaged and weakened sections of the masonry supports down to solid material and reconstruct the

---

[13] As previously stated, *see* ¶ 49, *supra*, Tolud accepted Bouis's representation that the *Scope of Work Repairs* was "the entire Paul Ferreras' report as it applied to 22 Tara," Trial Tr. 1 at 23:8-15, but Tolud still requested that Bouis keep him in the loop if there was any new material, which Bouis had agreed to do. Trial Tr. 3 at 11:9-12:4. *See* ¶ 52, *supra*.

[14] In response to the question why he waited until after closing to provide the Second Ferreras Report to Plaintiffs, Bouis testified that he "never gave them these plans," Trial Tr. 2 at 206:12-15, and that he "didn't recall" putting the plans in the folder. *Id.* at 207:5. Then, when asked whether he intended never to disclose them, whether he intended to keep them secret, Bouis, in turn asked, "Was I under any obligation to provide these plans?" *Id.* at 207:9.

[15] LaPlace testified that his understanding of the CMU work in all CBEC units being retrofitted, including Unit 22, entailed the following: "[t]hat the wall and the ceiling and the slab had to be reinforced and that wall needed to come out and then they'd put heavier, stronger wood, as well as epoxy by light bolts, et cetera, to bolt the upper rafter and the roof as well as the slab." Trial Tr. 1 at 180:1-5.

walls including vertical and horizontal reinforcements; fill all CMU cells solid with mortar." Pls.' Ex. 4 at 67 (Bates Stamp No. TS-000148). [16] Other pages of the First Ferreras Report provide pertinent information relating to all of the condominium units, such as page 5 of the report which provides in the "General Notes" that Ferreras "observed extensive storm damage" to the fourteen buildings on Tara Way and that the majority of the damage occurred to the upper units, "including interior and exterior sections of the masonry bearing walls . . . ." Pls.' Ex. 4 at 5 (Bates Stamp No. TS-000086). Thus, the Court does not find credible that Bouis had not seen the term "CMU" in reference to a wall in his loft prior to reading the lawsuit filed by the Toluds or that he, as an owner of a unit damaged by Hurricane Irma, who also has an engineering degree and served on the CBEC Board, would disregard tens of pages in a report specific to the reconstruction and repair of his unit and to the condominium complex as a whole when he received it in January 2018.

73.    Almost two months after closing, on August 10, 2018, LaPlace sent a letter to all owners at CBEC regarding the scheduled reconstruction of the condominiums. Trial Tr. 1 at 46:8-24. The letter provided, in relevant part:

> [A]ll loft roofs will be subject to extensive construction and reinforcement. The common wall between all loft units will be cut down approximately 2 feet and rebuilt with solid poured, steel reinforced bond beams. Again, I ask all owners to secure or remove all items in the loft units.

Pls.' Ex. 10 at 1.

74.    In response to the letter, Tolud reached out to LaPlace and set up a meeting with the Board President, the Project Manager for Custom Builders (the contractors completing the reconstruction), and LaPlace, that took place on September 13, 2018, to discuss "what was going to go on in [Tolud's] unit." Trial Tr. 1 at 49:3-19, 127:11-12, 166:15-20.

75.    Tolud testified that, following the meeting, he understood the reconstruction to his unit would involve the following:

> That [his] unit was basically going to become a construction zone; that [his] upper unit was -- that the CMU wall was, in fact, going to be demolished and

---

[16] In fact, the term "CMU" appears in the First Ferraras Report more than 40 times. *See generally* Plaintiffs' Exhibit 4.

> rebuilt; that Simpson straps and such were going to be added to the beams;
> that [his] roof was going to be opened up, either from the inside or the outside,
> depending on how they decided to do it; that the party wall, the shared wall
> between [his] Unit 22 and the unit next door at the loft level, was going to have
> to be cut at the roof line so that they can install a beam which would benefit
> Unit 20 and make the roof stronger.

*Id.* at 49:22 - 50:8.

76.     According to the construction schedule published in the August 10, 2018,
letter, reconstruction at 22 Tara Way was to begin September 18, 2018, and conclude around
October 25, 2018. Pls.' Ex. 10 at 2. Plaintiffs removed virtually all of the furniture from the
loft prior to the expected date of construction in September, but the repair work to the condo
didn't begin until sometime in October of 2018. Trial Tr. 1 at 50:9-16, 19-21.

77.     On September 23, 2018, Tolud sent an email to LaPlace and Steve Russell,
counsel to the Board, renewing his request for items from the January 28, 2018, annual
meeting that he had requested in March of 2018. Pls.' Ex. 18; Trial Tr. 1 at 125:1-20.

78.     In response to Tolud's email, on September 24, 2018, LaPlace forwarded 1.)
the "Cowpet East Damage Evaluation," dated October 24, 2017 (First Ferreras Report); 2.)
the Owners Package for the Annual Meeting held January 28, 2018, which contained the
Summary of Specific Reconstruction, containing the lists of repairs the CBECOA and condo
owners would be responsible for respectively; and, 3.) the *Scope of Work Repairs* for Unit 22.
Pls.' Ex. 18; Trial Tr. 1 at 126:9-11. *Accord* ¶ 42, *supra*, re: First Ferreras Report.

79.     Tolud testified that Custom Builders covered what they could with plastic and
wood board and made "troughs so that the debris and stuff [could] be easily transported out
of the house," but the loft was "a major construction zone," with dust throughout the condo,
the family displaced, and construction workers going in and out of their space for months.
Trial Tr. 1 at 51:14 - 52:14.

80.     Of all the reconstruction, Tolud testified that the demolition and rebuilding of
the CMU wall was the biggest issue and that it took several weeks. *Id.* at 96:17-24, 100:1-4.

81.     The reconstruction and repair of Unit 22 lasted from October of 2018 through
the beginning of March of 2019. *Id.* at 50:9-16, 51:3-5.

82. In addition to purchasing the replacement sliding glass doors, the Toluds had to complete the finishes, including the inside painting, replacing the fixtures, etc., after Unit 22 was turned back over to them after the reconstruction. Trial Tr. 1 at 124:4-8; Trial Tr. 2 at 53:12-22.

83. Defendants listed and marketed Unit 22 as a viable source of rental income. Trial Tr. 2 at 214:17-24; Trial Tr. 1 at 12:10-22. *See also* ¶ 35, *supra.*

84. Plaintiffs anticipated that they would be able to earn income from seasonal rentals and was one of the main reasons they were interested in purchasing the condo. Trial Tr. 2 at 44:18-23, 45:9-12; Trial Tr. 1 at 12:10-22, 56:11-13, 58:4-7, 132:14-23.

85. The ability to use a portion of Unit 22 for short term rentals was a matter of discussions between the parties before the closing. Trial Tr. 1 at 28:3-8.

86. Defendants' agent, Barringer, represented to Plaintiffs' agent, Walters, that Unit 22 was earning $125.00 per night for the studio and $200.00 per night for the loft. Trial Tr. 2 at 117:23 - 118:10. *Compare* Trial Tr. 2 at 220:13-19, where Bouis testified that the rental amounts were and $125 per night for the studio and $175 per night for the loft.

87. The loft reconstruction was mostly completed by March 2019, but the contractors re-entered several times through November 2019. Trial Tr. 2 at 42:2 - 43:1.

88. When Plaintiffs purchased Unit 22, they anticipated renting the studio or loft portion of their home during holidays and Carnival, which they could not do during the construction period, September 2018 through March 2019. Trial Tr. 1 at 85:14 - 86:11, 123:11 - 124:22. Because Carnival took place in April of 2019, only the winter holiday occurred during the construction period. Thereafter, Plaintiffs did not rent either the studio or the loft in 2019 nor before the COVID pandemic, which began in March of 2020.[17] *See id.* As such, the Court finds that the most that may have been lost in rent was two weeks during the 2019 holidays.

---

[17] At trial, the Court took judicial notice of the fact that during the COVID pandemic, beginning in March 2020, the Governor of the Virgin Islands prohibited hotels and Airbnbs from renting to non-residents for several months. Trial Tr. 1 at 122:12 - 123:8.

89.    Plaintiffs passed up available homes for $550,000 and $600,000, based upon the appearance of and representations that Unit 22 would not require major, disruptive construction. Trial Tr. 1 at 10:12 - 11:10; Trial Tr. 2 at 52:15 - 53:7. *See also* Trial Tr. 1 at 16:10-17.

90.    Tolud testified that had he known of the full extent of the reconstruction recommended for Unit 22, he either would have pursued the first property upon which he had made an offer and not make an offer on Unit 22 or would have negotiated a lower price for Unit 22. Trial Tr. 1 at 53:16 - 56:9; Trial Tr. 3 at 7:3-16, 14:18 - 15:8.

91.    Notwithstanding the above, there is no evidence that Defendants had any conversations or interaction with Tara Bouis.

## II. CONCLUSIONS OF LAW

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

2.    Federal courts exercising diversity jurisdiction over a matter must apply state or territorial substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).  As such, Virgin Islands' law governs in this case.

3.    The parties' sale and purchase of the condominium at 22 Tara Way, Cowpet Bay East, St. Thomas, U.S. Virgin Islands, and circumstances related thereto form the basis of this action.

4.    Plaintiffs timely filed their Complaint within two (2) years of learning of the actions of Defendants' alleged fraudulent conduct.

### A. Fraudulent Concealment

5.    In the absence of the Supreme Court of the Virgin Islands articulating a position regarding this cause of action, the Court quotes the decision of the Virgin Islands Superior Court in *Gov't of the V.I. v. Takata Corp.*, 67 V.I. 316 (Super. Ct. 2017):

> To state a claim for fraudulent concealment, a plaintiff must plead that: (1) the defendant concealed or suppressed a material fact; (2) the defendant had a duty to disclose the fact to the plaintiff; (3) the defendant knew or had reason to know that the material fact had been concealed or suppressed; (4) the defendant concealed or suppressed the material fact for the purpose of inducing the plaintiff to act or refrain from acting; and (5) the plaintiff suffered

> pecuniary loss caused by the his or her justifiable reliance on the concealed or
> suppressed material fact.

*Id.* at 417 (after conducting a *Banks* analysis to determine the soundest rule for the Virgin
Islands for claims of fraudulent concealment).

6.    Whether a defendant has the requisite duty to disclose:

> is determined by the facts and circumstances of the case, through an
> application of the following factors: (1) the relationship of the parties; (2) the
> relative knowledge of the parties; (3) the value of the particular fact; (4) the
> plaintiff's opportunity to ascertain the fact; (5) the customs of the trade; and
> (6) other relevant circumstances.

*Id.* at 417-18 (citing *Armstrong Bus. Servs. v. AmSouth Bank*, 817 So. 2d 665, 677 (Ala. 2001)).

7.    The Court finds that Bouis knew or had reason to know that the CMU wall in
the loft of Unit 22 would be demolished and reconstructed, a material fact that he knew or
had reason to know that he concealed or suppressed.

8.    The Court further finds that Bouis had a duty to disclose the material fact of
the destruction of the CMU wall in Unit 22 because of (1) the relationship of the parties -- in
which Bouis had significantly more knowledge of the facts, not only as the owner of the
property but also as a member of the CBECOA Board throughout the planning stages for the
reconstruction and repair of CBEC; (2) the relative value of the fact that the CMU wall in the
loft of Unit 22 would have to be torn down and rebuilt; (3) the Tolud's demonstrated inability
to ascertain the material fact by other means; (4) if applicable, the emphasis of Virgin Islands'
*caveat emptor* case law on a defect in real property being discernible; and (5) the fact that,
here, Bouis had personally sent the First Ferreras Report to all owners of units at CBEC and
should have been aware of the importance of Plaintiffs' access to the material fact(s)
contained therein. *See Takata Corp.*, 67 V.I. at 417-18.[18]

---

[18] Defendants contend that they had no "legal or contractual duty to disclose anything to the Plaintiffs/Buyers."
Defendants' Trial Brief (ECF No. 50) at 6. Defendants broadly declare that "[u]nder Virgin Islands Law, there is
no general obligation of the seller to tell the buyer everything negative that the buyer might be interested in
learning about the transaction or item to be purchased . . . *caveat emptor* remains the rule . . . ." *Id.* (quoting *Gov't
of the V.I. v. ServiceMaster Co., LLC*, 72 V.I. 114, 142 (V.I. Super. Ct. 2019) (citing *Bonilla v. Volvo Car Corp.*, 150
F.3d 62, 70 (1st Cir. 1998)). However, the quoted sentence is followed by a significant caveat in the opinion:
"But only 'absent false statements or half truths.'" *ServiceMaster*, 72 V.I. at 142 (quoting *Bonilla v. Volvo Car
Corp.*, 150 F.3d 62, 70 (1st Cir. 1998)). Further, Defendants' quote is taken from the *ServiceMaster* court's
discussion of the duty to disclose in the context of mail and wire fraud as predicate acts under the Racketeering

9.      As such, Defendant Bouis should have expected the nondisclosure of the extent of the repairs/reconstruction to induce Plaintiffs to purchase the condo. The Court, therefore, concludes that Defendant Bouis failed to disclose the document(s) and the material fact of the demolition and reconstruction of the CMU wall to induce Plaintiffs to buy the property.

10.     The Court also finds that Plaintiffs justifiably relied upon the concealed fact/withheld information and that this reliance caused them to incur a financial loss through lost rental income and the purchase of sliding glass doors and other required finishes such as paint.

11.     Accordingly, the Court finds that Plaintiffs have succeeded on Count One of their Complaint, fraudulent concealment, against Defendant Bouis.

12.     Notwithstanding the Court's finding as to Bouis' liability as to Count One, the Court finds that there is a lack of evidence as to liability by Tara Bouis for fraudulent concealment. There is no evidence that Tara Bouis knew or had reason to know about any issue concerning the CMU walls. There is no evidence that Tara Bouis knew or had reason to know that a material fact concerning the CMU walls (or any other aspect as to the property) was concealed or suppressed. Finaly, simply being the spouse of Sasha Bouis does not impute liability on Tara Bouis. Accordingly, the Court will enter judgment in favor of Tara Bouis on Count One.

### B. Fraud in the Inducement as Fraudulent Misrepresentation

13.     To prevail upon a claim for fraudulent misrepresentation sounding in tort, Plaintiffs are required to show that Defendants misrepresented a material fact, opinion, intention, or law that he knew or had reason to believe was false and that he made for the purpose of inducing Plaintiffs to act or refrain from acting and which Plaintiffs justifiably relied upon and that caused Plaintiffs a pecuniary loss. *Love Peace v. Banco Popular de Puerto Rico*, 75 V.I. 284, 291 (2021).

---

Influenced and Corrupt Organizations Act ("RICO"), thus rendering it completely inapposite to the facts and claims presented in the case at bar. In the absence of any law or caselaw that directly supports Defendants' contention and broad declaration, the Court finds that such contention and declaration do not accurately describe the state of Virgin Islands law.

14.    Plaintiffs' Complaint alleges a claim for "fraud in the inducement" for allegedly failing to disclose or disclosing false information which misled Plaintiffs into believing the condominium they were purchasing would not have to undergo extensive reconstruction, which, in turn, induced them to enter into the contract for sale and eventual sale of the condo. Fraud in the inducement under Virgin Islands law appears most often to be treated as "claims to void or rescind a contract where the claimant's assent was obtained through fraud," *Wilkinson v. Wilkinson*, 70 V.I. 901, 907 (2019), and, thus, is adjudged under contract law. Where such fraud is claimed under Virgin Islands tort law for damages rather than recission, the claim is typically that of fraudulent misrepresentation. *See id.* ("At the outset, we must distinguish between actions for fraud or deceit -- sounding in tort and seeking damages -- and claims to void or rescind a contract where the claimant's assent was obtained through fraud -- commonly called 'fraud in the inducement.'"), *quoted in Arvidson v. Bucher*, 71 V.I. 277, 355-56 (Super. Ct. 2019)). *See also Love Peace v. Banco Popular de P.R.*, 75 V.I. 284, 288-89 (Super. Ct. 2021) ("Legally, misrepresentation appears in two distinct legal areas -- contracts and torts. In torts, misrepresentation involves assertions of fraud or deceit where the plaintiff seeks damages for the purported wrongdoing . . .. In contracts, misrepresentation may enable a plaintiff to rescind a contract which the plaintiff was fraudulently induced to execute." (citing *Wilkinson*, 70 V.I. at 908)). Here, Plaintiffs seek damages rather than recission of the contract. Thus, the Court treats this claim as one for the tort of fraudulent misrepresentation.

15.    The Court finds that Plaintiffs have shown that Defendant Bouis misrepresented that the *Scope of Work Repairs* was the "extent of" or the "entire" Ferreras' Report, and, by so doing, misrepresented the work to be done in Unit 22, a material fact.

16.    The Court also finds that Bouis either knew or had reason to know that this representation of a material fact was false, based upon his access to and possession of the complete First and Second Ferreras Reports, his role as the owner of Unit 22, and his role on the Board during the planning and discussion of the reconstruction of the CBEC condominium complex.

*Tolud, et al. v. Bouis, et al.*
Case No. 3:19-cv-0039
Memorandum of Decision
Page 23 of 27

17.     The Court also finds that Bouis made this misrepresentation for the purpose of inducing Plaintiffs to contract to purchase the unit and/or not to cancel the contract of sale, that Plaintiffs justifiably relied upon this misrepresentation, and that Plaintiffs' justifiable reliance on this misrepresentation caused them to incur a pecuniary loss, specifically that of lost rental income and the cost of sliding glass doors and other required finishes required to complete the renovations following the reconstruction of Unit 22.

18.     Consequently, the Court finds that Plaintiffs have succeeded on Count II of their Complaint, fraud in the inducement as the tort of fraudulent misrepresentation, against Defendant Bouis.

19.     Notwithstanding the Court finding of liability as to Sasha Bouis, the Court finds that there is a lack of evidence as to any fraudulent acts committed by Tara Bouis. Thus, judgment will be entered in Tara Bouis' favor on Count II.

### C. Defenses

#### 1. Gist of the action

20.     The Supreme Court of the Virgin Islands very recently addressed the gist of the action doctrine and concluded that "the gist of the action doctrine does not represent the soundest rule for the Virgin Islands." *Robertson v. Banco Popular De P.R.*, S. Ct. Civil No. 2022-0026, 2023 VI 3, at ¶ 38 (2023). In view of the Virgin Islands Supreme Court's rejection of the doctrine, the Court finds that Defendants' gist of the action defense is not a viable defense, and therefore, inapplicable.

#### 2. Economic Loss rule

21.     The Economic Loss rule bars recovery or suit under a tort claim for economic or pecuniary losses that arise out of a contractual agreement. Although this doctrine has been adopted by the Superior Court as the soundest rule for the Virgin Islands, "the Superior Court has not adopted the economic loss doctrine as a 'bright-line rule.'" *Takata*, 67 V.I. at 420 (cautioning that application of the economic loss doctrine requires a "fact-intensive, case-by-case approach"); *see also Turnbull v. Univ. of the V.I.*, Case No. ST-07-CV-239, 2016 V.I. LEXIS 22, at *18-19 (Super. Ct. Mar. 2, 2016)*. Many courts apply the Economic Loss rule where a claim of fraud is interwoven with a breach of contract claim. *See Takata*, 67 V.I. at 416.

22.    As the Court has found herein, the material fact(s) that Defendant Bouis fraudulently concealed was withheld from Plaintiffs prior to the contractual agreement, and the Plaintiffs justifiably relied upon Defendant Bouis' fraudulent misrepresentation to enter into and not cancel the contract. Thus, the Court finds that neither of the claims are interwoven with a breach of contract claim, nor does either the fraudulent concealment or fraudulent misrepresentation claim arise out of the contractual agreement. Consequently, the claims are not barred by the Economic Loss rule.

### 3. Doctrine of *Caveat Emptor*

23.    Defendants argue that Plaintiffs had the opportunity to thoroughly inspect the unit during a two-week inspection period. Defendants' Trial Brief (ECF No. 50) at 3-4. They then argue that Plaintiffs cannot recover any damages, based upon the disclaimer of representations and warranties clauses of the contract, because they accepted the contract after such inspection period. *Id.* at 11, 17. More specifically, Defendants rely upon the doctrine of *caveat emptor*. *Id.* at 4-7.

24.    The Court was unable to locate any Virgin Islands caselaw directly on point regarding this doctrine or its application to facts and/or claims similar to the ones presented in the matter at bar. Only one case, nearly four decades old, even references the doctrine in relation to the sale of non-new construction, namely, *Gov't of the V.I. v. Thomas*, Nos. 1084/1981, 758/1982, 318/1983, 319/1983, 1985 V.I. LEXIS 53, at *18 (Terr. Ct. Feb. 28, 1985). There, the reviewing court recounted the result of its research into "what a buyer of a *new* home from a builder . . . has a right to expect in return for his investment . . . ." *Id.* at *18 (emphasis added). However, to begin, the court quotes from 25 A.L.R. 3d 383, which notes that "most courts still adhere to the proposition that in the usual, normal sale of lands and *old* buildings the ancient doctrine of caveat emptor applies . . . ." *Id.* and n.16 (emphasis added) (citing *Rogers v. Scyphers*, 251 S.C. 128 (1968)). Because the *Thomas* court was addressing newly built homes, it does not state whether Virgin Islands law, in 1985, conformed to this majority rule. In addition, no current opinions rendered in the Virgin Islands establish that the doctrine of *caveat emptor* is a viable defense. In fact, the Superior Court of the Virgin Islands recently extended the implied warranty of good workmanship

from new construction and additions to include "repairs of existing structures as well," *Blue Water Constr., Inc. v. Hill*, No. ST-2020-CV-00212, 2022 V.I. LEXIS 15, at *37 (Super. Ct. Feb. 11, 2022). In support of its reasoning to move away from a rule that protects only the first home buyer of a newly constructed home and not require privity of contract to enforce the implied warranty, the *Hill* court notes that, as one court put it, "'as a society, we have evolved from an era when caveat emptor ruled the legal world to one where, at least in consumer transactions, caveat venditor is the heir apparent to this crown . . ..'" *Id.* at *36 (quoting *Nichols v. R.R. Beaufort & Assocs.*, 727 A.2d 174, 181 (R.I. 1999)).

25.     Even *assuming arguendo* that the doctrine of *caveat emptor* is a viable defense in the Virgin Islands, it appears that Virgin Islands courts have required that the defect or irregularity be "discernible from the record." *Fuller v. Rosewell Properties LLC, Ltd.*, No. ST-16-CV-438, 2018 V.I. LEXIS 27, at *18 (V.I. Super. Ct. Mar. 5, 2018) (where the seller erroneously reported the acreage of the lot sold); *see also Lombardi v. Wingo*, 54 V.I. 725, 738 (D.V.I. Jan. 6, 2011) (finding that purchaser was deemed to have notice of defects in a tax sale). *See also Jackson v. Smith*, Civil No. 730/1981, 1983 V.I. LEXIS 80 (Terr. Ct. Feb. 28, 1983) (where the court states that the purchaser was under no duty to investigate the total area of real property).

26.     Given the Virgin Islands' apparent application of *caveat emptor* only where the defect is "discernible," the Court determines whether the defect in the CMU wall was discoverable through inspection. While the issue with the CMU wall was certainly discovered by Paul Ferreras, as noted in his reports, there is no indication in the record that the problem was visible or otherwise discernible through the course of an ordinary inspection of any particular unit, and, specifically of Unit 22. Nothing in the record explains the process through which Ferreras ascertained the need to repair the CMU walls throughout the condominium complex; equally, there is nothing in the record to indicate that such a defect was discernible on sight through an ordinary, pre-closing buyer's inspection. Accordingly, the Court concludes that, even if the doctrine of *caveat emptor* is a viable defense under Virgin Islands' law, the application of the doctrine is inappropriate here, where an ordinary inspection was not sufficient to detect the problem with the CMU wall in Unit 22.

*Tolud, et al. v. Bouis, et al.*
Case No. 3:19-cv-0039
Memorandum of Decision
Page 26 of 27

### D. *Damages*

27.     Plaintiffs seek damages in the amount of $115,500.00, plus pre-judgment and post-judgment interest, as well as punitive damages in the amount of $100,000.00, and reimbursement of their costs, including attorney's fees. Plaintiffs calculate these requested damages from the following components:

    a.) Loss of use and enjoyment of the full property for eight (8) months, during the period of construction, for both Plaintiffs:

    $100 per person x 2 persons x 30 days x 8 months = $48,000.00;

    b.) Lost rental income for eight (8) months, based on a daily claimed rent of $250.00:

    $250/night x 30 days x 8 months = $60,000.00;

    c.) Cost to finish the loft following the construction = $7,500.00.

Joint Final Pretrial Order (ECF No. 66) at 6.

28.     While none of the Virgin Islands cases reviewed by the Court regarding the two causes of action involved in the matter at bar describe the measure of damages imposed against a defendant found liable, the elements for both of the claims include a showing of "pecuniary loss" caused by Plaintiffs' justifiable reliance upon the fraudulently concealed facts and fraudulent misrepresentation. *See Takata Corp.*, 67 V.I. at 417; *Love Peace*, 75 V.I. 284 at 291. Thus, the Court finds that the measure of damages is the "pecuniary loss" suffered by Plaintiffs.

29.     In this matter, even though Plaintiffs testified regarding their other purchase options at lower prices, Tolud stated that he either would have pursued one of those options *or* negotiated a lower price for Unit 22, and not that he either would have absolutely not entered into the contract or would have canceled the contract for Unit 22 had Bouis not engaged in the fraudulent conduct. Further, in the absence of any expert testimony regarding the difference in value of the condo "as listed" and its actual value at the time of sale, that is, as requiring the demolition and reconstruction of the CMU wall in the loft, the Court finds that Plaintiffs' damages cannot include an amount reflecting their loss of the "benefit-of-the-bargain."

*Tolud, et al. v. Bouis, et al.*
Case No. 3:19-cv-0039
Memorandum of Decision
Page 27 of 27

30.    In addition, the Court finds that the term "pecuniary loss" does not include amounts for Plaintiffs' loss of use and enjoyment of the property.

31.    As to lost rental income, the Court finds the testimony of how often the Toluds would have rented the studio or loft too speculative in nature to award damages. Although the Toluds were prevented from renting a portion of their space during the eight months of construction, the Toluds also chose not to rent either the studio or the loft during the ensuing year, prior to the start of the pandemic. As such, under the circumstances here, the resulting lack of rental history makes any such rental claim mere speculation. Accordingly, the Court declines to award any damages for loss of rental income.

32.    The only "pecuniary loss" itemized by Plaintiffs is the amount spent to finish the loft following the repairs. However, Plaintiffs withdrew any claim for damages based on the cost to rehab the loft. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law, ECF No. 102 at 24 n. 6 ("Plaintiffs are withdrawing the claim for costs to rehab the loft.").

33.    The Virgin Islands courts have declared that "to successfully assert a claim for punitive damages, the Plaintiff need only to show that the Defendants' conduct was outrageous due to having an evil motive or reckless indifference to the rights of others." *Crawford v. Bobeck*, SX-09-CV-292, 2019 VI SUPER 104U, at *16 (July 30, 2019); *see also Pedro v. Ranger Am. of the V.I., Inc.*, 70 V.I. 251, 284 n.108 (Super. Ct. 2019) (quoting *Takata*, 67 V.I. at 424)).

34.    The Virgin Islands also has recognized that "punitive damages is an appropriate sanction for fraudulent or intentional misrepresentation." *Gerace v. Bentley*, SX-2005-CV-00368, 2022 VI SUPER 78, at *67 (Sept. 12, 2022) (citing *DeNofio v. Soto*, No. 00-5866, 2003 U.S. Dist. LEXIS 12225, *4 (ED. Pa. June 24, 2003) ("Punitive damages may be imposed where there is 'sufficiently aggravated conduct contrary to the plaintiffs interests, involving bad motive or reckless indifference . . . .' Fraudulent misrepresentation certainly meets this standard." (citation and ellipsis omitted)) and *Naranjo v. Paull*, 1990- NMCA 111, 111 N.M. 165, 803 P.2d 254, 261 (Ct. App. 1990) ("Punitive damages is an appropriate sanction for common-law fraud."))).

35.    However, it is "well recognized that no award for punitive damages may be made where actual damage has not been suffered." *Brandy v. Flamboyant Inv. Co.*, 772 F. Supp. 1538, 1543 (D.V.I. App. Div. 1991) (citing *Hilbert v. Roth*, 149 A.2d 648, 652 (Pa. 1959)).

36.    Although the Court finds that Plaintiffs have prevailed on their causes of action as alleged in Counts One and Two, the Court finds that Plaintiffs are not entitled to any compensatory damages. Since Plaintiffs are not entitled to compensatory damages, punitive damages will not be awarded.

37.    Costs and attorney's fees will be awarded upon submission and approval of an affidavit or other certification from counsel for Plaintiffs in accordance with the applicable rules of procedure.

### III.  <u>CONCLUSION</u>

For the reasons stated above, the Court finds for the Plaintiffs and against Alexander "Sasha" Bouis on both counts of the Complaint, fraudulent concealment and fraud in the inducement as the tort of fraudulent misrepresentation. However, the Court finds that there is insufficient evidence on either count as to Tara Bouis. An appropriate Judgment follows.

**DATED:** September 30, 2024                    */s/ Robert A. Molloy*
                                                 **ROBERT A. MOLLOY**
                                                 **Chief Judge**